(77 South. 986)

### TYSON v. JENNINGS PRODUCE CO.
### (6 Div. 22.)

(Court of Appeals of Alabama.   Nov. 13, 1917.
Rehearing Denied Dec. 18, 1917.)

1. APPEAL AND ERROR ⟨key⟩1170(1)—HARMLESS ERROR.
    Error not injuriously affecting the substantial rights of the parties is not reversible in view of court rule 45 (175 Ala. 21, 61 South. ix), preventing reversal for harmless error.

2. EXCEPTIONS, BILL OF ⟨key⟩56(4) — TIME TO FILE—CERTIFICATE.
    Where the clerk's certificate shows that the judgment was rendered against the defendant on the 6th day of March, 1915, the bill of exceptions was marked "Presented" by the trial judge on the 4th day of June, 1915, and signed by him on the 28th day of August, 1915, there is no merit in the motion to strike the bill of exceptions.

3. COMMERCE ⟨key⟩80—FOREIGN CORPORATIONS —SUITS BY.
    Under Code 1907, § 3650, providing that the provisions relating to foreign corporations shall not apply to corporations doing only an interstate commerce business within the state, those provisions cannot be construed to prevent such corporations from suing in the courts of the state without complying with the statutory requirement to enforce valid contracts.

4. FACTORS ⟨key⟩1—WHO ARE.
    Where a foreign corporation shipped potatoes on consignment to a commission broker for him to sell, he was a "factor" within the definition of a factor as one who, as a business, sells goods and merchandise consigned and delivered to him by or for his principals and for a compensation commonly called factorage or commission.
    [Ed. Note.—For other definitions, see Words and Phrases, First and Second Series, Factor.]

5. COMMERCE ⟨key⟩40(1) — FOREIGN CORPORATIONS — "INTERSTATE COMMERCE"—"DOING BUSINESS WITHIN STATE."
    A foreign corporation which shipped potatoes on consignment to a factor in the state, who sold for others, and who had possession of the potatoes, and sold them in his own name, and paid expenses, drayage, and freight, and deducted his commission from the proceeds, remitting the balance to the corporation, which had no place of business in the state, was engaged in interstate commerce, and not "in business within the state," so as to bar its action for the balance in the absence of compliance with the state laws.
    [Ed. Note.—For other definitions, see Words and Phrases, First and Second Series, Doing Business; Interstate Commerce.]

6. FACTORS ⟨key⟩25—MISTAKES—LIABILITY.
    Where plaintiff wired a factor asking whether he could sell potatoes at 81 cents, and he replied, "Can sell at 81, competitors offering at 75," intending to say "Can't sell at 81," and the potatoes were shipped and sold at less than 81 cents, plaintiff could recover the difference in balance due, after deduction of proper commission, between the price of 81 cents and the actual selling price.

    Bricken, J., dissenting.

Appeal from Circuit Court, Jefferson County; C. B. Smith, Judge.

Action by the Jennings Produce Company against C. A. Tyson. Judgment for plaintiff after trial before the court without a jury, and defendant appeals. Affirmed.

Certiorari denied 201 Ala. 331, 77 South. 993.

John R. Tyson, of Montgomery, and Alexis T. Gresham, of Birmingham, for appellant. Sterling A. Wood, of Birmingham, for appellee.

SAMFORD, J. The complaint, and amendment thereto, was in eight counts. The first six assignments of error relate to the action of the court in its rulings on pleadings, and the ninth assignment of error relates to the action of the court in overruling the defendant's motion to expunge certain papers from the record.

[1] We have carefully examined these pleadings and the motion, and are of the opinion that the actions of the trial court in its various rulings were either without error, or, if the court was in error in overruling the defendant's motion to expunge, such action did not injuriously affect any substantial rights of the defendant, and therefore did not constitute reversible error. Rule 45, Supreme Court (175 Ala. p. 21, 61 South. ix). The pleadings, as shown by the record, clearly present for consideration the issues between the parties, which were based upon the following facts: On August 25, 1910, the Jennings Produce Company, a Virginia corporation doing business at Rural Retreat, Va., wired to C. A. Tyson, a merchandise broker and factor doing business at Birmingham, Ala., as follows:

---

⟨key⟩For other cases see same topic and KEY-NUMBER in all Key-Numbered Digests and Indexes

"Can you sell car or two sacked potatoes good white stock prompt shipment to-morrow or Saturday answer."

In reply to this message Tyson wired the produce company the next day as follows:

"We have received telegram of Thursday can sell one car potatoes nice size seventy-five cents per bushel delivered answer."

To which the produce company replied by wire on August 26th:

"We can barely break even at alcohol delivered sacked. Our car is nice stock. Telegraph immediately if you can sell."

On that day Tyson replied by wire as follows:

"Wire received, can sell at alcohol competitors offering at aimless answer."

The words "alcohol" and "aimless" were code words, the meaning of which was known to both parties, "alcohol" being interpreted "81 cents per bushel," and "aimless" being interpreted "75 cents per bushel." Acting on the last telegram, the produce company, whose business was dealing in wholesale produce in car lots, shipped to Tyson at Birmingham and billed to him a carload of potatoes, which they expected him to sell at 81 cents per bushel, as per the correspondence above set out, deduct his commission and charges, and remit the balance to the plaintiff. Appellant, Tyson, made a mistake in his last telegram by writing therein the word "can" instead of the word "can't," and in response to a request for payment of the balance of the proceeds of the sale of the potatoes wrote the plaintiff as follows:

"On my return to the city, I found your favor of October 21st awaiting me. In reply will say after looking up my wire in question, I found I made a mistake in using the word 'can' instead of 'can't,' but at the same time I stated in the wire that your competitors were offering potatoes freely at 75 cents per bushel. You should have known that it was impossible for me or any other broker to get 6 cents per bushel above the market price for your potatoes when our competitors were offering and selling potatoes of the same quality, and you should have known there was something wrong, and you should have asked."

It is undisputed that Tyson made the mistake and sold the potatoes at less than 81 cents per bushel, and, after deducting his commission, remitted the balance to the plaintiff. This suit is for the difference between the price obtained by Tyson and the 81 cents per bushel, less the commission charged.

In reference to his business Tyson testified as follows:

"My business is to handle goods on commission. Goods which I handle are shipped me and sold by me, after they arrive here, but to different parts of the city. Then I remit to the party shipping the sale price, less my commission. Every one of the potatoes were sold after they got here."

Tyson is described on his letter heads as "Wholesale Broker and Manufacturer's Agent" and "Wholesale Brokerage and Commission."

[2] The plaintiff's complaint and the facts showed that it was a corporation incorporated under the laws of the state of Virginia, and doing business at the town of Rural Retreat, in said state, and it is not contended that the plaintiff has complied with the laws of the state of Alabama with reference to qualifying to do business in this state. The case was tried by the court without a jury, and judgment rendered in favor of the plaintiff, from which judgment the defendant prosecutes this appeal, which is submitted upon appellee's motion to strike the bill of exceptions and upon the merits. The clerk's certificate shows that the judgment was rendered against the defendant on the 6th day of March, 1915. The bill of exceptions was marked "Presented" by the trial judge on the 4th day of June, 1915, and signed by him on the 28th day of August, 1915. Therefore there is no merit in the motion to strike the bill of exceptions, and it is overruled.

[3] There can be no doubt that this case involves a construction of the statutes of this state requiring foreign corporations doing business in this state to qualify under the statute, and also whether the transaction between the plaintiff and the defendant is governed by the federal law controlling interstate commerce. As was said by Judge Brown, in the case of Citizens' National Bank v. Bucheit, 14 Ala. App. 518, 71 South. 86:

"It is manifest that it is not the purpose of these statutes to interfere with transactions of strictly interstate commerce (Code 1907, § 3650), and they must be so enforced as not to unreasonably burden such commerce, or the right of foreign corporations to invoke the power and authority of the courts to recover the fruits thereof. The expression found in some of our cases, to the effect that such corporations cannot sue in the courts of this state without qualifying under the Constitution and statutes, is too broad in its scope. Such a rule, if strictly enforced, would result in imposing unreasonable restraint on acts of interstate commerce. Sioux Remedy Co. v. F. M. Cope, 235 U. S. 197, 35 Sup. Ct. 57, 59 L. Ed. 193."

[4] It is apparent from the facts in this case, and there is no substantial conflict in the evidence, that the potatoes were shipped to Tyson, who was a factor or commission merchant, and that Tyson was acting as a factor or commission merchant in handling the goods so shipped to him. The dealings between the parties being that of factorage, and not a mere selling agency, it is clear that Tyson was not the agent of the plaintiff in the sense that plaintiff was actually doing a business in the state of Alabama, contrary to the statute. A factor is generally defined to be an agent who, as a business, sells goods and merchandise consigned and delivered to him by or for his principals and for a compensation commonly called factorage or commission. 19 Cyc. p. 115. A definition which has been adopted in Alabama is as follows:

"A factor who has the possession of goods differs materially from a broker. The former is a person to whom goods are sent or consign-

ed, and he has not only the possession, but, in consequence of its being usual to advance money upon them, has also a property in them and a general lien upon them. When, therefore, he sells in his own name, it is within the scope of his authority, but a broker has not the possession, and the vendee cannot be deceived by that circumstance. Employing a person to sell goods as a broker does not authorize him to sell in his own name." 6 Mayfield Dig. p. 92, par. 1.

So that under the dealings between the parties we have the following facts: (1) Tyson is a broker or factor, and sells for other consignees than the plaintiff; (2) he actually had possession of the goods of the plaintiff, these goods having been shipped, billed to, and consigned to him; (3) he sells them in his own name, and the obligation moves originally through him; (4) all the expenses of sale incident to the payment of freight, drayage and the like are paid by the defendant, Tyson, and deducted from the sale price, together with his commission; (5) the plaintiff paid to Tyson a commission on the sale of the goods consigned or sold through him; (6) the plaintiff does not have in its possession any goods in Alabama; it maintains no place of business, and did not at this time sell any goods except the car of potatoes which was sold through the defendant, so far as this record discloses; (7) by reason of his possession of the property and his right to commission and the expenses paid by him, Tyson acquires a special interest in the property. Prior to this time the defendant had disposed of a car of cabbage for the plaintiff, under conditions similar to the above.

[5] These things do not constitute a doing of business by the plaintiff company in the state of Alabama, within the meaning of the Constitution and statutes of this state, and is therefore governed by the laws relative to interstate commerce. The decisions of the court are not in entire accord upon this question, but it has been generally held that, where a foreign corporation places its product in the hands of local merchants in the domestic state, to be sold on commission, the foreign corporation is not doing business in the domestic state. Allen v. Tyson-Jones Buggy Co., 91 Tex. 22, 40 S. W. 393, 714; Brown Seed Co. v. Richardson, 53 Misc. Rep. 517, 103 N. Y. Supp. 243. In the case of Atlas Engine Works v. Parkinson (D. C.) 161 Fed. 223, the question involved was whether a corporation was doing business in the state of Wisconsin, within the meaning of the statute of that state requiring foreign corporations to make certain reports, etc. In that case the Atlas Company made a contract with Plattville Company whereby the latter was made the agent of the former to sell its engines and boilers on commission in a certain part of Wisconsin, and to receive and hold strictly on consignment all machinery shipped by it, to make monthly reports of all merchandise on hand unsold, pay freight, oil, and keep in good order without charge, pay taxes, keep the goods insured, hold unsold machinery subject to the order of the claimants, ship it as directed, and pay charges; the Atlas Company to refund freight, also to guarantee payment for the machinery sold. At the expiration of two years from the date of shipment unsold goods were to be bought and paid for in cash at the option of the Atlas Company, or loaded on cars, the Plattville Company to pay freight. The Plattville Company was authorized to contract that the Atlas Company would replace defective parts of the machinery; the Plattville Company to guarantee the payment of all accounts. The Plattville Company was also to have the benefit of all sales made in its territory as fixed by its contract. The court here pointed out that a foreign corporation might employ a part of its property in a state without doing business in such state within the meaning of a statute like the one in question. The court held that the Atlas Company was not doing business in Wisconsin. The court said:

"That the agency contract relative to interstate commerce seems quite clear. It does not purport to sell anything. No vendor or vendee is mentioned. It was a bailment for sale by a factor under del credere commission."

Another case is that of Butler Bros. v. U. S. Rubber Co., 156 Fed. 1, 84 C. C. A. 167, where it was decided by the United States Circuit Court of Appeals that, where the rubber company, a New Jersey corporation, shipped rubber goods to Butler Bros. Shoe Company, a Colorado corporation, Butler Bros. being wholesale merchants engaged in the purchase and sale of rubber goods and other merchandise at Denver, and where in 1901 the shoe company made factorage contracts with the rubber company for the shipment of goods to the shoe company at Denver, the court, through Mr. Justice Sanborn, who wrote the opinion, said:

"Let us now turn to the contracts, observe what the rubber company agreed to do and what it actually did under them, and determine, if possible, whether or not in making or performing these agreements it was guilty of doing any business within the meaning of the Constitution and statutes of Colorado. It agreed to ship the goods from its warehouse, or its mill, upon the orders of the appellee, to that company in Denver, and it did so. It contracted to do, and it did, nothing more. It never had any office or place of business in Colorado. It never received, stored, handled, or sold any goods, or collected any money for the sales of any goods, in that state under its contract. It never incurred, assumed, or paid any expenses of doing all these things, or of conducting any of the business. The shoe company had and maintained a place of business in Colorado, it rented or owned the place in which the business in Colorado was done, and it agreed to bear all the expenses and losses of receiving, storing, and selling the goods, and it did so. The purchasers of the goods were purchasers from it, solicited and secured by it. They were its customers, and liable to it for the purchase price of the goods. The goods were billed to them in the name of the shoe company as consignee. The profits of the business and the work of the business, the labor of receiving, storing, and selling the goods, were

the shoe company's. The profits constituted its factorage, its compensation, for carrying on the business. * * *

"A farmer sends to a commission merchant in the city a dozen barrels of apples for him to sell. The factor puts them in his store, sells them, receives the proceeds, and remits them, less his factorage. The farmer from time to time sends 1,000 barrels during the season, and they are sold and the proceeds remitted in the same way. The farmer is not carrying on the business of selling apples in the city, but the factor is. * * *

"The transaction between the parties to this suit is interstate commerce. The rubber company did not agree to do, and did not actually do, any of the business of receiving, storing, and selling the goods in Colorado. The shoe company did agree to do, and did do, that business."

In this case a writ of certiorari was denied by the Supreme Court. 212 U. S. 577, 29 Sup. Ct. 686, 53 L. Ed. 658. To the same effect is the case of Monongahela Distillery Co. (D. C.) 186 Fed. 220; Leisy & Co. v. Hardin, 135 U. S. 100, 10 Sup. Ct. 681, 34 L. Ed. 128; Savage v. Jones, 225 U. S. 501, 32 Sup. Ct. 715, 56 L. Ed. 1182; Scott v. Donald, 165 U. S. 107, 17 Sup. Ct. 262, 41 L. Ed. 648; Ex parte Young, 209 U. S. 125, 28 Sup. Ct. 441, 52 L. Ed. 714, 13 L. R. A. (N. S.) 932, 14 Ann. Cas. 764; Kehrer v. Stewart, 197 U. S. 60, 25 Sup. Ct. 403, 49 L. Ed. 663. The Supreme Court of this state has followed this view in the case of Lee v. Intendant & Town Council of La Fayette, 153 Ala. 675, 45 South. 294; Crum v. Town of Prattville, 155 Ala. 154, 46 South. 750. Authorities which, upon first blush, would appear to be against this view, are those cases challenging the rights of various states to impose ad valorem taxes upon goods stored in the state for distribution, and are not in conflict with these views; and in the case of American Steel & Wire Co. v. R. A. Speed, 192 U. S. 500, 24 Sup. Ct. 365, 48 L. Ed. on pages 546 and 547, Mr. Justice White explains and differentiates the cases which otherwise might seem to be in conflict along this line.

[6] Holding to these views, as we do, and believing that these statutes should be construed in such manner as not to embarrass commerce between the states, it follows that the trial court did not err in rendering judgment for the plaintiff.

There is no error in the record, and the judgment of the trial court is affirmed.

Affirmed.

BROWN, P. J., concurs.

BRICKEN, J. (dissenting). I cannot concur in the conclusions of fact and law in the majority opinion prepared by Judge SAMFORD. The evidence in this case is without conflict, and, in my opinion, shows a consignment only, and not a sale of the potatoes to Tyson.

Appellee's theory of its action, as set forth in the brief filed by its counsel, is as follows:

"The action was for $96.36 balance due on a car load of potatoes, sold by appellee to the appellant, on September 22, 1910." (Appellee's Brief, p. 8.)

I am ready to concede that, if the transaction was a straight-out sale to Tyson, then it would be an interstate commerce transaction, and the case should be affirmed. However, as I see it, the facts do not support the appellee's theory of the case, nor do they warrant the conclusions of fact and law set forth in the majority opinion.

The first inquiry from the produce company to Tyson was: "Can you sell car or two sacked potatoes?" Certainly this cannot be construed to mean: "Will you buy a car of potatoes?" Tyson's response was "Can sell," not that he would buy.

The plaintiff's general manager, its only witness, testified as follows:

"The defendant [Tyson] agreed to sell the potatoes mentioned in the correspondence at 81 cents per bushel. The date of this agreement was August 26, 1910. The plaintiff would realize, under the agreement, the sum of $510.30 net, after deducting freight and brokerage at 2 cents per bushel on 810 bushels. The plaintiff realized from said transaction only $430.14, leaving a balance due and unpaid by the defendant in the sum of $80.16."

On November 2, 1910, Tyson wrote the produce company as follows:

"On my return to the city, I found your favor of October 21st awaiting me. In reply will say after looking up my wire in question I find that I made a mistake in using the word 'can' instead of 'can't,' but at the same time I stated in the wire that your competitors was offering potatoes freely at 75 cents per bushel; you should have known that it was impossible for me or any other broker to get 6 cents per bushel above the market for your potatoes, when our competitors was offering and selling potatoes of same quality, and you should have known there was something wrong, and you should have asked.

"As for the loss in resacking, etc., I refer you to my letter of August 30th, notifying you of the condition of the potatoes on arrival of the car. I regret exceedingly our mistake, as it is my first of its kind. I am just in receipt of a check from the party on the last car of cabbage and will send you a check with statement to-morrow sure.

"Yours very truly, C. A. Tyson, T."

On November 4, 1910, the produce company wrote Tyson in response to his letter acknowledging a mistake that had been made as follows:

"In reply to your letter under date of November 2, 1910, we note that you say that you made a mistake in your wire to us under date of August 26th, in which you state, 'Can sell at 81 cents per bushel,' beg to advise that we did not question your ability to do what you stated, you would or could do in this wire, and it was wholly upon this wire statement that we forwarded the car N. & W. No. 27399, containing 810 bushels sacked potatoes."

On December 3d Tyson replied as follows:

"In response to your favor of the 30th will say that I cannot see why you should expect me to make good the loss you claim on the car of potatoes N. & W. 27399, as you should have known there was a mistake in my wire, as I mentioned in same that your competitors was offering potatoes freely at 75 cents, and you ought to have known that it was impossible for me or any other broker to get 6 cents per bushel more for your potatoes, and it seems to me that

you should have had the wire repeated, or wired asking if I had not made a mistake. Suppose I had not made a mistake, and the market had declined while the car in question was in transit, would not I be forced to sell the car at the market price. In view of all the facts, it seems to me that you are unreasonable in your demands. Therefore, I positively decline to yield to same.

"Yours very truly,        C. A. Tyson, T."

Tyson's testimony, which is uncontradicted, bearing on this question, is as follows:

"My business is to handle goods on commission. The goods which I handle are shipped here, and sold by me after they arrive here out to different parties in the city. Then I remit to the parties shipping to me at the sale price, less my commission. The goods are shipped to me from different parties such as plaintiff in this case, and then sold by me to people here in town. I had previously sold some cabbage for the plaintiff in this case in this way. The potatoes in question were shipped from Virginia to this city, and then sold out here at the market price. The potatoes came in sacks and were re-sacked by me. I sold some of the potatoes for 75 cents and some for 73 cents. The potatoes were in a rotten condition when they arrived. It was impossible to sell them without resacking, and such resacking is the custom among brokers here under such circumstances. The potatoes came in two-bushel sacks, and I put them in one-bushel sacks here. Every one of the potatoes were sold after they got here. There was not a single one sold before they arrived."

It will be observed that the plaintiff nowhere says it sold potatoes to Tyson, and that Tyson has never contended, so far as the record shows, that he purchased the potatoes, and there is not, in my opinion, one scintilla of evidence in this record to the effect that Tyson sold the potatoes in his own name, if that be material. The record is silent as to whose name was used in the subsequent sale of the potatoes, except Tyson's statement to the effect that he had previously sold some cabbage for the plaintiff in this case in the same way that the potatoes were handled. The evidence further shows without conflict that Tyson paid the freight and expense of resacking with plaintiff's money, which was derived from the sale of the potatoes, and that the potatoes were not sold in the original packages, but were resacked in Birmingham for the produce company by Tyson, at its expense, and that the loss of the rotten and damaged potatoes was borne by it.

My conclusion therefore, from the undisputed evidence, is that the sale of the cabbage in the first instance, and of the potatoes here, was made by Tyson for the produce company. This being true, it is my opinion that the law says that Tyson, in making such sales, was doing business for his principal, and that the principal was doing business through him. A reference to some elementary principles applicable to factors sustain the correctness of this conclusion.

"It is well settled, as a general rule, that a written contract made by a factor in his own name for the purchase or sale of goods for his principal will bind the principal, and he may sue and be sued thereon exactly as if he were named in it, for it is treated as the contract of

the principal as well as of the agent." 11 Ruling Case Law, p. 782.

The principal is bound by the acts and contracts of his factor done with his consent or ratified by him, and is also entitled, as the ultimate party in interest, to all the advantages of such acts and contracts, as against third parties with whom his agent deals; and it is immaterial that the principal was unknown at the time, or that the third party dealt with the agent, supposing him to be the sole principal. 11 Ruling Case Law, p. 782.

It is also settled law in Alabama that a commission merchant is an agent employed by his principal to sell goods consigned or delivered to him, and that in making such sale his act is the act of the principal, even though the sale may be made in the commission merchant's name. In Lehman-Durr Co. v. Pritchett, 84 Ala. 512, 4 South. 601, the court had the following to say on this subject:

"The business, duties, and liabilities of factors and commission merchants are substantially the same, the terms being ordinarily used interchangeably. A factor, or commission merchant, as generally defined, is an agent employed to sell goods or merchandise consigned or delivered to him, by or for his principal, for reward, usually a commission. The features which mainly distinguish a factor from a broker are the former is intrusted with the possession, disposal, and control of the property, and may sell in his own name, binding the principal; and the latter does not usually have possession, disposal, and control, and should sell in the name of the principal."

In Alabama Fertilizer Co. v. Reynolds, and Lee, 79 Ala. 502, Chief Justice Stone, speaking for the court, said:

"But there is another class of traders called commission merchants, who sell, but do not buy. Their particular designation is derived from the fact that they are the mere agents to sell the goods of others for a commission. They are distinguished from the former class, sometimes by the advertised or proclaimed line of business in which they are engaged, sometimes by the fact that they disclose their principals, and profess only to be intermediaries to bring seller and buyer together, sometimes by selling in the name of the principal, and possibly in other ways. A commission business is confined to the making or sales for others."

We are required to follow the decisions of the Supreme Court of this state, and I therefore hold that this court is required to say that, when a commission merchant such as Tyson was sells a carload of potatoes that are consigned to him, under the circumstances disclosed by this record, his act in so doing is the act of the principal.

Having shown that Tyson was the agent of the produce company for the purpose of selling its potatoes in Birmingham, and that his acts were its acts, it remains to determine whether or not the services rendered in selling them, that is to say, the act of selling them and delivering them to the Birmingham trade, by Tyson, was an act or acts of interstate commerce. I adopt this as a test, for the reason that the only exemption af-

forded foreign corporations from the operation and effect of section 3642 et seq. of the Code is that the article shall not be construed to "interfere with, or prohibit, or regulate the transaction of interstate commerce or business authorized under the laws and Constitution of the United States."

To repeat, my opinion is that Tyson's acts in connection with the disposition of these potatoes were the acts of his principal, and if the services rendered by him were so connected with the subject sold as to make them a portion of interstate commerce, then the appellee was not doing business in this state, for the obvious reason that its agent, through whom it acted, was engaged in interstate commerce; but, on the other hand, if such agent was not engaged in interstate commerce, but was doing business in this state for the appellee, then the appellee must be held to have done business here through said agent.

In Hopkins v. United States, 171 U. S. 578, 19 Sup. Ct. 40, 43 L. Ed. 290, the principal question in the case was whether or not commission merchants engaged in handling cattle consigned to them at Kansas City for owners throughout the various states were engaged in interstate commerce. The Supreme Court of the United States said:

"The business of defendants is primarily and substantially the buying and selling, in their character as commission merchants, at the stockyards in Kansas City, live stock which has been consigned to some of them for the purpose of sale, and the rendering of an account of the proceeds arising therefrom. The sale or purchase of live stock as commission merchants at Kansas City is the business done, and its character is not altered because the larger proportion of the purchases and sales may be of live stock sent into the state from other states or from the territories. * * * If an owner of cattle in Nebraska accompanied them to Kansas City, and there personally employed one of these defendants to sell the cattle at the stockyards for him on commission, could it properly be said that such defendant, in conducting the sale for his principal, was engaged in interstate commerce? * * * We think not. On the contrary, we regard the services as collateral to such commerce and in the nature of a local aid or facility provided for the cattle owner towards the accomplishment of his purpose to sell them. * * * Is the true character of the transaction altered when the owner, instead of coming from Nebraska with his cattle, sends them by a common carrier consigned to one of the defendants at Kansas City with directions to sell the cattle and render him an account of the proceeds? The services rendered are the same in both instances, only in one case they are rendered under a verbal contract made at Kansas City personally, while in the other they are rendered under written instructions from the owner given in another state. This difference in the manner of making the contract for the services cannot alter the nature of the services themselves. If the person, under the circumstances stated, who makes a sale of cattle for the owner by virtue of a personal employment at Kansas City, is not engaged in interstate commerce when he makes such sale, we regard it as clear that he is not so engaged, although he has been employed by means of a written communication from the owner of the cattle in another state. * * * The commission agent, in selling the cattle for their owner, simply aids him in finding a market; but the facilities thus afforded the owner by the agent are not of such a nature as to thereby make that agent an individual engaged in interstate commerce."

Suppose, instead of employing Tyson, the appellee had shipped the car of potatoes to Birmingham, and sent its general manager from Virginia to solicit orders from and sell and deliver said potatoes to the Birmingham trade. Would it not, under such circumstances, be doing business in this state? If so, is it possible that a difference in the name and residence of the agent (which is the only means whereby a corporation may act) is the test by which the difference between interstate commerce business and doing business in this state is determined. It would seem that the name and residence of the agent is relatively unimportant. It is what he does, where he performs, and who he is acting for that are material to the inquiry. His residence here, if material at all, would tend to corroborate the appellant's contention that the appellee was doing business here.

In the Milburn Wagon Co. v. Commonwealth, 139 Ky. 330, 104 S. W. 323, a foreign corporation furnished wagons on board cars at its factory at Toledo, Ohio, for sale by one Humble under an agent's commission contract in Kentucky. The title to the wagons remained in the corporation, and the funds derived from the sale of the wagons were kept separate and apart until remitted to the corporation. The court said:

"We are of opinion that such contract * * * constitutes only an agency, and is not a selling by the owners as wholesalers to the alleged agents as retailers, retaining merely a lien upon the property to secure the payment. * * * We are of the opinion that the evidence was sufficient to show that appellant was carrying on business through an agent in this state."

In Cone v. Tuscaloosa Mfg. Co. (C. C.) 76 Fed. 891, the court said:

"The business of defendant corporation is twofold. It manufactures cotton goods, and then sells them. The manufacture is wholly conducted in the state of Alabama. The sale, however, of so much of its product as is known in the trade as 'plaids, checks, and stripes,' has been, since 1891, conducted here through another corporation as selling agent. Examination shows that defendant does not sell its entire product to the selling agent, which thereafter resells, and thus makes its profit or loss. The selling agent is strictly an agent who sells defendant's goods for the account of said defendant, and for its services in effecting such sales and guaranteeing the solvency of the purchasers receives a commission. The goods, even when sent to the selling agent, remain the property of the defendant until sale is effected with some third party. The defendant thus offering for sale and selling its goods here is 'doing business within the state' quite as much as if it offered and sold them through a salaried officer resident here."

In John Deere Plow Co. v. Wyland et al., 69 Kan. 255, 76 Pac. 863, 2 Ann. Cas. 304, the court said:

"The note sued upon was given for the purchase price of machinery sold by plaintiff to defendant, the negotiations for such sale having been made, and the order for such machinery having been taken, by an agent of plaintiff re-

siding in Kansas; that the order was in writing, made by defendant, and delivered to the local agent, by whom it was forwarded to plaintiff at Kansas City, Mo., for acceptance or rejection; that plaintiff then accepted the order, and shipped the machinery to the local agent, for delivery to defendant."

It was held that the transaction constituted doing business in that state.

In Elliott v. Parlin & Orendorff Co., 71 Kan. 665, 81 Pac. 500, the court said:

"The method of business of the plaintiff company seems to have been that it shipped its goods to the dealer ordering the same with the understanding that the dealer should pay the freight, hold the goods as the property of the company, and sell the same, and have as his profit all that he acquired over and above the price at which the goods were listed to him. If so, the Kansas dealer was virtually the resident agent of the Parlin and Orendorff Company for the sale of its goods, that is, as between the company and the dealer."

In Fay Fruit Co. v. McKinney, 103 Mo. App. 304, 77 S. W. 161, it appears that a general salesman of the appellant corporation resided in Kansas City, Mo., at which place he had an office, the rent of which was paid by the corporation. The plan of business was for the plaintiff to ship fruit from California to some point in another state, not to some customer who had ordered or contracted for the fruit, but consigned to itself. It would then advise its salesman at Kansas City that the fruit had been shipped, and he, having applications for fruit, would "divert the car" at Kansas City by ordering it stopped at that place, take his purchaser to the railway yards, and sell as it stood in the car, collect the price, and remit to plaintiff. The court said:

"The goods were shipped, not in response to an order, or a sale already made by plaintiff through a 'traveling salesman or drummer,' but to plaintiff's own order, and were to be sold by its agent to whomsoever would purchase at the proper price."

It was held that the corporation was doing business in Missouri.

Many other cases could be cited, but these are sufficient to emphasize the distinction I think it proper to observe in this case.

At first blush, it must be conceded that the case of Butler Brothers Shoe Co. v. United Rubber Co., 156 Fed. 1, 84 C. C. A. 167, seems opposed to my conclusions. This is the strongest case cited in support of the majority opinion; but a careful examination reveals that the facts distinguish it from the case at bar, and if this is not true, it is certainly in conflict with the decisions of the Supreme Court of the United States in the Hopkins Case, supra, which authority I prefer to follow. In the Shoe Company Case the company assumed all of the risk of the goods. Here Tyson assumed no risk whatever. There the consignee was to pay the freight and expenses of selling and delivering to its customers. Here the produce company paid the freight and expense of resacking. There the shoe company guaranteed the rubber company against all losses from sales to the extent of the shoe company's profits. Here Tyson made no guaranty at all. There the shoe company agreed to pay the rubber company for the goods at agreed prices, which was so much below the prices at which the shoe company sold to its customers that it thereby secured a liberal commission. Here Tyson did not agree to pay for the shipment, or any part thereof. There the shoe company had an option to purchase at the termination of the contract all of the consigned goods in its possession. Here Tyson had no such option. There the shoe company's commission consisted of profits which it made over and above the agreed purchase price of the article sold. Here Tyson's commission consisted in a fixed amount per bushel for making the sale.

Much that was said in the shoe company opinion is obiter, and it is manifest that several of the illustrations therein used were used for that purpose only, and not intended to be declarations of law.

The other authorities cited in the majority opinion do not, in my opinion, support its holdings. Many of them are distinguishable from the case at bar on the facts; but it would prolong this opinion to undue length to discuss them seriatim. It is sufficient to say that I have been unable to find any case which holds that the acts of an agent doing business in a state which is not in its nature interstate commerce do not constitute doing business in such state by his principal. Holding these views, I am therefore unable to reach any other conclusion but that Tyson was the agent of the produce company for placing the potatoes on the market in Birmingham for said company, and that, when Tyson sold the potatoes, he sold them for and on behalf of the corporation; in other words, that it was the appellee selling through Tyson, and that Tyson's acts were not connected with or related to interstate commerce in such a way as to permit the appellee to claim protection of that provision of the federal Constitution, and therefore such conduct on his part for and on behalf of the appellee constituted doing business in this state by the produce company.

There being no contention that the company had complied with the laws of this state with reference to doing business therein, and it being admitted that it was a foreign corporation, I am of the opinion that the contract between it and Tyson was absolutely void (Code 1907, § 3653; Jones v. Martin, 74 South. 761 [1]), and that therefore, for the reasons stated, the judgment rendered in favor of appellee was erroneous, and should be reversed, and one here rendered in favor of appellant.

[1] 15 Ala. App. 675.